IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


JIMMY L. LOGSDON,

                          Plaintiff,

           v.                           CASE NO.  05-3276-SAC
ROBERT SAPIEN, et al,

                          Defendants.


**MEMORANDUM AND ORDER**

     This is a civil rights complaint filed by plaintiff, an
inmate at the El Dorado Correctional Facility, El Dorado, Kansas
(EDCF).  Plaintiff has also filed a motion for leave to proceed
in forma pauperis (Doc. 2).  Plaintiff's claims concern his
prolonged detention in administrative segregation (ad seg).
Having screened all the materials filed, the court finds
plaintiff is required to submit to the Clerk of the Court an
initial partial filing fee of $77.50, has failed to document
exhaustion of administrative remedies, and has failed to allege
sufficient facts to state a claim.


**INITIAL PARTIAL FILING FEE**

     Under 28 U.S.C. 1915(b)(1), when funds exist as exhibits
indicate they do in this case, the court is required to assess an
initial partial filing fee of twenty percent of the greater of
the average monthly deposits or average monthly balance in the
prisoner's account for the six months immediately preceding the
date of filing of a civil action.  Having examined the records,
the court finds the average monthly deposit to plaintiff's

account is $95.95 and the average monthly balance is $388.86. The court therefore assesses an initial partial filing fee, rounded to the lower half dollar, of $77.50. Plaintiff will be given twenty (20) days to submit this amount to the Clerk of the Court.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

Plaintiff has not adequately demonstrated total exhaustion of administrative remedies on his claims.   Under 42 U.S.C. 1997e(a):

> No action shall be brought with respect to prison conditions under (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

Plaintiff is a prisoner confined in EDCF, and this is an action "with respect to prison conditions" brought under Section 1983. The KDOC has provided a mechanism for administrative review[1], and under the PLRA plaintiff was obligated to use it before coming to federal court.

In a recent opinion the Tenth Circuit Court of Appeals emphasized that, "Exhaustion is a pleading requirement rather than an affirmative defense," and "failure to adequately plead exhaustion therefore amounts to a failure to state a claim upon which relief can be granted."   <u>Simmat v. Unites State Bureau of</u>

---

[1]
In addition to the regular inmate grievance procedure, IMPP 20-107(I)(A)(effective February 15, 2002) provides: Upon verbal request of any inmate in ad seg, an inmate request form and a writing implement with which to make a written complaint to the administrative segregation review board concerning the inmate's condition or treatment shall be provided to that inmate."

Prisons, ---F.3d---, at *25, 2005 WL 1541070 (10th Cir. July 1, 2005), citing Steele v. Fed. Bureau of Prisons, 355 F.3d 1204, 1210 (10th Cir. 2003), cert. denied, 125 S.Ct. 344 (2004).  The Tenth Circuit further noted when a prisoner fails to state a claim, the PLRA requires the court to dismiss the complaint sua sponte:

> The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions . . . if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.

42 U.S.C. 1997e(c)(1).

Plaintiff did not file his complaint on forms provided by the court.  He pleads with regard to exhaustion only that he "filed form-9 seeking solution", "filed grievance to U.T. Manager Sapien," and "appealed grievance response to Warden Roberts" as well as the Secretary of Corrections.  These allegations are not sufficient to demonstrate exhaustion as they do not describe what claims were presented or the content of administrative responses.

Plaintiff has attached to his complaint several exhibits which document administrative actions relating to his ad seg.  He provides no exhibits or description of the notice of reasons presumably provided at the time of his initial placement in ad seg on April 26, 2002, or of any objections made by him at the time of his initial placement or for the ensuing two years. Plaintiff exhibits only two monthly reviews of his ad seg: KDOC "Administrative Segregation Review (Pursuant to IMPP 20-106), Monthly Review" dated June 23, 2004 and April 11, 2005.

Complaint (Doc. 1) Attachs. 29, 35.  Both these reports indicate

Logsdon's "placement classification" was pursuant to "IMPP 20-104

(I)(B)(13) Other Security Risk," and provide the "Reason for

Segregation Placement" as follows:

> On 4/26/02 an investigation was initiated concerning
> inmate Logsdon and several fellow Gangster Disciples in
> conjunction with EDCF Case No. 02-008.  The result of
> the investigation has shown that inmate Logsdon had
> been repeatedly engaged in UPG activity including
> direct and indirect initiating of fight and conflicts
> between inmates of rival UPG's.  Logsdon has even
> admitted this to some degree.  In order to maintain the
> security of this facility inmate Logsdon should be
> placed in segregation until such time he no longer
> poses this threat.

Id.  On the 2004 report, by "Inmate's Comments" is written "I

want to be put in for the program and be able to participate in

IMU.  I am ready to get out of the hole."  By "Reasons for

Recommendations" is written "Placement reasons," and under

"Inmate Behavior While in Segregation" is written "Sat.

behavior."  Id., Attach. 29.  On the 2005 report, by "Inmate's

Comments" is written "Declined to see Board," by "Reasons for

Recommendations" is "Continue to work on positive behavior," and

under "Behavior While in Segregation" is "No DR."  Id., Attach.

35.  No change in status was recommended in either report.

The earliest grievance exhibited by plaintiff is a Form-9

"Inmate Request to Staff Member" (hereinafter Form-9) dated April

27, 2004, submitted to Gary Wilson, Classification Administrator,

in which Logsdon complained he was in ad seg for nothing, asked

what he needed to do to get out, and sought placement in "I.M.U.

program."  Id., Attach. 55.  Plaintiff does not exhibit or

describe any response to this Form-9 or any appeal of an adverse

decision.  Thus, this exhibit does not demonstrate exhaustion of administrative remedies.

Plaintiff exhibits an undated grievance apparently submitted in June, 2004.  Id., Attach. 44.  In this grievance, plaintiff complained he had been in ad seg "on O.S.R." for 26 months because of I & I allegations, which he had "never received the opportunity to adjudicate" through the disciplinary process.  He referred to allegations in his "segregation report" of repeated involvement in U.P.G. activity and fights.  He argued that such involvement is a violation of prison rules requiring that a disciplinary report be written within 48 hours of discovery, and that after completion of  the investigation, he should have been either charged or released.  He also claimed a Lt. Barnes told him that after investigating information that Logsdon and other inmates were going to stab another inmate, Barnes did not believe it, and would let everyone back into general population except Logsdon, whom he said to hold for a few months because his "name kept coming up in U.P.G. activity."  Plaintiff further stated Barnes told him in 2003  that he had received more information indicating Logsdon "was not involved," that "someone had a personal vendetta and wanted (him) out of the way" instead, and that Barnes would tell the classification board what he knew.  Plaintiff also claimed he had rights to due process triggered by his placement in ad seg which had been violated, and asked for a "chance to adjudicate" all allegations through the disciplinary process or have them dropped.  Id.

On June 23, 2004, the Unit Team responded:

5

Contrary to what you have indicated in your grievance, a disciplinary report is not a prerequisite for being placed in Administrative Segregation, Other Security Risk.  IMPP 20-104 1B (13) indicates that "The Warden may place in administrative segregation or lock-up in the inmate's own cell any inmate or group of inmates if the inmate or inmates are engaging in behavior which threatens the maintenance of security or control in the correctional facility."  Further, "the Warden shall explain in writing, the threat to security and show justification for segregation or lock up under these circumstances and a copy of this explanation and justification shall be provided to the Secretary of Corrections."  These elements have been met.  You have received the administrative segregation report outlining the reasons for your placement and the Secretary of Corrections has also received this report.

As you have mentioned, I & I conducted an investigation that resulted in information that implicated you in behavior that poses a threat to the facility.  Lieutenant Barnes has been contacted and he has indicated that although there may have been information, which contradicted some of the investigation, there was still sufficient information to place you on Other Security Risk status.

Id., Backs of Attachs. 46 & 47.  Plaintiff appealed to Warden Roberts complaining he was "not satisfied with the U.T.M. response" and stating that even though Barnes told I & I he received information contradicting Logsdon's segregation report, "preposterous allegations" remained in his segregation report, and I & I felt there were "other reasons" for his placement. Warden Roberts concurred with the Unit Team Manager's response. Id., Attach 43, 52.  Plaintiff exhibits a form (Id., Attach. 47) entitled "Appeal of Grievance to Secretary of Corrections," which is stamped "Received Jul 14 2004 DOC Facility Management Area." However, he does not exhibit or describe his grounds for appeal or the decision of the Secretary of Corrections.  Moreover, this one grievance which may have been fully exhausted does not contain all the claims in the complaint.  Thus, it does not

demonstrate total exhaustion of administrative remedies.

Plaintiff exhibits a Form-9 "Inmate Request to Staff Member" he filed on February 27, 2005, (Id. Attach. 38-39), addressed to Program Management Committee (hereinafter PMC) member Bratton, in which he complained of his continued placement in ad seg when he had been "DR free for 29 mos." He alleged in this grievance that he "never received the opportunity to adjudicate (himself) through the disciplinary process because (he) was never given a disciplinary report." He argued that the allegations underlying his placement in ad seg constitute violations of prison rules, and he should have received a disciplinary report and disciplinary hearing.

On April 1, 2005, Bratton responded (Id., Attach. 40) to plaintiff:
        . . . I would . . . encourage you to develope (sic) a
        (sic) action plan for yourself to apply upon release to
        a less restricted area. You need to communicate this
        plan with seg review board in order to gain their
        support at making a recommendation on your behalf for
        release. I assure you once you obtain a recommendation
        the PMC Board will thoroughly evaluate your situation.

No appeal from this response to the Warden or the Secretary of Corrections is exhibited. Thus, it cannot satisfy the total exhaustion requirement.

Plaintiff exhibits another administrative grievance he filed on April 17, 2005. This grievance was filed "on" named members of the "PMC Board . . . for the false allegations they made in my 180 day review." Logsdon asked that the members read his attached papers, and stated, "All I want is a response from the PMC members who made these false allegations wich (sic) are affecting my program." In the papers attached to his grievance,

Logsdon referred to comments by board members as untrue. Those comments were: "information indicates this inmate involved in illegal activity within the past twelve months"; "I & I indicates that STG activity is ongoing," with "until . . . the STG activity ceases I question he is appropriate for IMU[2]. . .;" and "involvement in illegal activities in past 12 months." Plaintiff complained in this grievance that he had "not had a disciplinary report (DR) in 30 months" and was told he would be released if he went 6 months and then a year without a DR. He also claimed he had been housed in ad seg for 36 months "for basically nothing" and had done everything asked of him, deserved to get out, and is segregated "merely on rumors" and "speculation." He specifically claimed he had not been involved in illegal activities in the past 12 months. He asked for a complete review of his case and a "second chance." The Unit Team denied this grievance.[3] Plaintiff does not exhibit or describe an appeal of this particular grievance to either the Warden or the Secretary of

---

[2] Plaintiff exhibits the "Program Management Committee Review" report dated March 21, 2005 (Id., Attach 36), which contained these comments under "Reason for Recommendation" for "Retention" by board members Bratton and Luman, and "Reason for Decision" to "Retain" by Warden Roberts, respectively.

[3]
On May 5, 2005, the Unit Team responded:
> You state in your grievance dated 4-17-05 . . . you are filing this grievance on the PMC board members . . . for the "false allegations they made in my 180 day review". You would like each of them to read (your) attached papers and respond. All you want is a response from the PMC members who made those false allegations which are affecting your program.

> UTM R. Sapien has made contact with the PMC board members you have listed on this grievance. Each member and all inclusive continue to state their recommendations as rendered in the 180 day review report. All PMC listed board members state their response is based on sound information they have received that raises concern for the safety and security of the facility due to this type of behavior that you have been involved in.

Id., Attach. 34.

Corrections.    It  therefore  fails  to  satisfy  the  exhaustion
requirement.

Plaintiff's exhibits, even taken together, fall far short of
demonstrating  he  has  timely  and  fully  grieved  the  claims  he
attempts  to  raise  at  this  time  in  federal  court.    Plaintiff
claims  in  his  complaint  that  (1)  his  placement  in  ad  seg  was
under  the  "disguise  of  Other  Security  Risk,"  (2)  he  was  not
provided a hearing with the opportunity to state objections or
reasons  against  his  ad  seg  placement  as  required  under  IMPP  20-
105  (I)(B),  (3)  he  has  been  in  ad  seg  "on  allegations  alone,"  (4)
the  Warden  has  not  explained  in  writing  the  threat  and
justification  which  led  to  his  placement  in  ad  seg  as  required  by
IMPP  20-104(I)(B)(13)(a)(1),  (5)  plaintiff  was  "obviously  placed
in"  ad  seg  for  an  alleged  emergency  on  April  26,  2002,  and
improperly  remains  segregated  under  the  same  emergency  status,
(6)  prison  authorities  are  ignoring  the  inmate  rule  book  which
provides  for  the  writing  of  a  disciplinary  report  within  48  hours
of  an  incident,  (7)  his  detention  in  ad  seg  is  not  based  on  "some
evidence,"  (8)  the  reasons  given  for  his  placement  in  ad  seg  -
his  involvement  in  and  directing  fights  among  UPG  members  and
being  an  active  member  of  the  UPG  Gangster  Disciple  -  if  true
would  have  resulted  in  disciplinary  or  criminal  action,  (9)  his
constitutional  rights  are  violated  by  his  detention  in  ad  seg  for
more  than  900  days  "without  an  evidence  hearing  or  a  disciplinary
report  or  charges,"  (10)  the  duration  of  his  restrictive
confinement  in  ad  seg  makes  it  "atypical"  and  therefore
unconstitutional,  (11)  the  warden's  signature  is  not  on  any  of

9

plaintiff's ad seg report, (12) defendants continue to add unfounded reasons to justify their actions, (13) plaintiff is subjected to monthly ad seg "review board proceedings that are a sham," (14) his detention in ad seg for 900 days is unwarranted, (15) he could not be a threat to the facility after 36 months in ad seg, (16) defendants violated the 5th, 8th, and 14th Amendments and equal protection by "imposing and/or supporting state law and/or regulations that perpetuated the significant and atypical duration of plaintiff's restrictive confinement contrary to state regulations, the U.S. Constitution and published court rulings," (17) unspecified actions of EDCF administrators violate the unspecified policies and procedures of the IMPP and plaintiff's constitutional rights, and (18) his stay in ad seg "rose to the level of cruel and unusual punishment."

Plaintiff also complains of numerous conditions in ad seg, and claims he is enduring a "significant and atypical hardship not foreseen as part of the normal incidents of prison life." As supporting facts, he alleges he has been denied the opportunity to participate in required programs, "religious worships," intramural sports, track and field events, weight lifting, table games, concerts and "inspirational speakings," mental health programs, music room, and work details. He further alleges he is denied access to the library with a large selection of legal and nonlegal material, exercise equipment, "certain canteen items," Kansas Correctional Industries Employment wages, the highest level of incentive pay, to purchase "Jaycee" food only available for general population inmates, and denied freedom of

association, the right to personally consult with law clerk, and the right to have photos taken.  Plaintiff additionally complains he is only afforded 5 one-hour periods of exercise a week, while general population gets 7 ninety-minute periods; and only 3 showers a week, while general population can shower everyday; and is continually exposed to yelling and screams of severely mentally ill inmates; food, urine and feces being thrown by other inmates; and "potential exposure" to infectious diseases.

Plaintiff cites legal authority discussing restrictive conditions of confinement and the testimony of a psychiatrist in an unrelated case concerning his opinion on the adverse, psychological impacts on inmates from prolonged segregation. Plaintiff implies that the social isolation and "reduced environmental stimulation" cause inmates to deteriorate mentally and physically, but does not present facts indicating such an injury has been suffered by him personally.

When the foregoing, lengthy list of claims raised in the complaint is compared with the claims presented in plaintiff's administrative grievances, it is clear that total exhaustion of administrative remedies has not been demonstrated.  For example, plaintiff has not complained in any exhibited administrative grievance that monthly reviews of his segregated status are a "sham," that he is improperly being held on emergency status, that prison officials have not followed specified regulations, or that the duration and restrictive conditions of ad seg described in his complaint are atypical as well as cruel and unusual. Instead, plaintiff's exhibits show that the only claims presented

11

in his one administrative grievance, which might have been fully appealed, were that allegations in his segregation report relied upon to retain him in segregation are untrue; and he has been denied the process due in disciplinary proceedings, including the timely filing of disciplinary reports and the chance to adjudicate the allegations against him in an evidentiary hearing.

The court concludes neither the complaint nor the record submitted by plaintiff provides information sufficient to satisfy the exhaustion requirement under <u>Simmat</u>, ---F.3d at *22. Consequently, an administrative record has not been fully developed, and the KDOC has not had the opportunity to correct any errors with regard to the procedures utilized in plaintiff's initial ad seg placement, the alleged problems with the monthly board reviews, plaintiff's challenges to the reasons for his placement and retention in ad seg, and the many conditions of which he complains in ad seg. <u>See Simmatt</u>, ___ F.3d at *24. It follows plaintiff has not sufficiently pled exhaustion of administrative remedies.

Morever, even though plaintiff may have exhausted a few of his claims in his single grievance that might have been fully appealed, it has recently been held that "the PLRA contains a total exhaustion requirement." <u>Ross v. County of Bernalillo</u>, 365 F.3d 1181, 1188-89 (10th Cir. 2004) (When multiple claims have been joined, all available prison grievance remedies must be exhausted as to all of the claims, and the presence of unexhausted claims in a complaint requires the district court to dismiss the entire action without prejudice). Plaintiff shall be

12

given time to supplement his complaint with proof that he has exhausted administrative remedies on all his claims. If he fails to sufficiently plead total exhaustion, this court will be required to dismiss the complaint without prejudice for failure to state a claim.

## DISCUSSION OF SUBSTANTIVE CLAIMS

The court also finds, upon initial screening, that the complaint is subject to dismissal for failure to state a claim on which relief may be granted due to the lack of legal merit of some of plaintiff's claims and his failure to state sufficient facts in support of other claims. The court recognizes that a "pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers. Haines v. Kerner, 404 U.S. 519 1972); Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the court cannot assume the role of advocate for the pro se litigant, and a broad reading of the complaint does not relieve the plaintiff of the burden of alleging sufficient facts to state a claim on which relief can be based. Id. (Conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based).

## VIOLATION OF KANSAS ADMINISTRATIVE REGULATIONS

To the extent plaintiff seeks relief for alleged violations of state statutes or Kansas prison regulations, he states no cognizable claim under Section 1983. Gaines v. Stenseng, 292

F.3d 1222, 1225 (10th Cir. 2002); see <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 150 (1970); <u>Hill v. Ibarra</u>, 954 F.2d 1516, 1520 (10th Cir. 1992).  To state a 1983 claim, a plaintiff must allege a deprivation of a federally protected right under color of state law.  See <u>Malek v. Haun</u>, 26 F.3d 1013, 1015 (10th Cir. 1994); <u>Hovater v. Robinson</u>, 1 F.3d 1063, 1068 FN4 (10th Cir. 1993)(The "failure to adhere to administrative regulations does not equate to a constitutional violation.").  Thus, plaintiff may not prevail simply by proving the violation of administrative regulations; rather, he must establish the loss of a constitutionally protected interest.

**<u>CLAIMS</u>**

Plaintiff complains he is confined in administrative segregation (ad seg) as "Other Security Risk" (OSR) for "alleged violations," which he claims prison officials "use" to "justify their actions."  He asserts the policies and procedures of the Kansas Department of Corrections (KDOC) are being violated as well as his constitutional rights in that he has been held in ad seg "for more than 900 days" without an "evidence hearing," a disciplinary report or charges.  He names as defendants the Warden and a Unit Team Manager at EDCF and the Kansas Secretary of Corrections.  The court is asked to declare that his constitutional rights have been violated, order defendants "dismissed from KDOC employment," grant injunctive relief in the form of "disciplinary actions" and a restraining order against retaliation, and award monetary damages as well as attorney fees

and expenses.

**FACTS**

As factual support, plaintiff alleges he was placed in ad seg at EDCF on April 26, 2002, based on numerous allegations including that he is an active member of the Security Threat Group "Gangster Disciples," was involved in initiating fights between rival U.P.G. members, has leadership roles, and is a threat to the safety and security of the facility.

Plaintiff recognizes[4] his placement in ad seg was pursuant to IMPP 20-104 (I)(B)(13) Other Security Risk, which pertinently provides:

> The Warden may place in administrative segregation . . . any inmate . . . if the inmate . . . (has) engaged in behavior which has threatened the maintenance of security or control in the correctional facility.

Plaintiff cites IMPP 20-104(I)(B)(13)(a)(1) as providing that the warden shall explain in writing the threat and show justification, and alleges "Something in wich (sic) was not done nor is the wardens signature on any of the petitioner's ad seg report." He also alleges he was not provided a hearing prior to placement with the opportunity to present objection or reasons against the placement, that defendants "continue to add unfounded reasons to justify their actions according to the ad seg report reviews received from the Board monthly," and he has

---

[4] Plaintiff also quotes IMPP 20-104 (I)(B)(2)(b), which provides: "Any inmate held in administrative segregation pending results of an investigation shall be charged or released within three working days . . . ." However, it does not appear that plaintiff is being held pending investigation. Plaintiff also cites IMPP 20-101(II)(A) regarding segregation under conditions of emergency; however, his own allegations and exhibits indicate he is not being held in ad seg under this IMPP but as other security risk.

been "subjected to monthly admin seg review boards proceedings that are a sham.  Plaintiff's numerous claims as outlined previously herein include some additional factual allegations.

## LEGAL STANDARDS

It has long been held that the due process rights of prisoners are subject to reasonable limitation or restriction in light of the legitimate security concerns of a prison institution, Bell v. Wolfish, 441 U.S. 520, 546-47 (1979); and that courts accord substantial deference to prison administrators in handling matters of internal security.  Rhodes v. Chapman, 452 U.S. 337, 349 FN14 (1981).  It has also long been settled that inmates do not enjoy a constitutional right under the Due Process Clause to remain in the general population.  Hewitt v. Helms, 459 U.S. 460, 468 (1983), *overruled in part on other grounds*, Sandin v. Conner, 515 U.S. 472 (1995); Bailey v. Shillinger, 828 F.2d 651, 652 (10th Cir. 1987); Templeman v. Gunter, 16 F.3d 367, 369 (10th Cir. 1994)(Inmates are not constitutionally entitled to any particular classification or degree of liberty while incarcerated, and therefore an inmate's placement in administrative segregation, standing alone, does not constitute a deprivation of liberty).  Hewitt explicitly held "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration," and thus does not involve "an interest independently protected by the Due Process Clause." Hewitt, 459 U.S. at 468-69.  However, the Supreme Court also held that where

state law creates a liberty interest in remaining free from conditions of administrative segregation, due process is implicated. Id. In order to be entitled to relief, plaintiff must show first that he has a constitutionally protected liberty interest in avoiding placement in ad seg at EDCF, and second that the process utilized to place and maintain him in ad seg did not satisfy constitutional requirements. See Wilkinson v. Austin, ___ U.S. ___, 125 S.Ct. 2384, 2395 (June 13, 2005).

## DENIAL OF PROCESS DUE IN DISCIPLINARY PROCEEDINGS

Plaintiff's main claim administratively and in his complaint, that he has been denied the due process required in disciplinary proceedings, has no legal merit. He complains he was segregated from the general population without the issuance of disciplinary reports or an evidentiary hearing. Kansas prison regulations plainly allow non-punitive as well as punitive segregated confinement. Where the segregated confinement is the result of disciplinary action, it is considered punitive; and inmates are entitled to recognized, minimum procedural process under the United States Constitution. Wolff v. McDonnell, 418 U.S. 539 (1974). Where the segregated confinement is non-punitive, it is authorized for the administrative purposes[5] specified in Kansas

---

[5] IMPP 20-104 (effective as amended 7/21/04) "SEGREGATION: Purpose of Administrative Segregation & Appropriate Placements," requires the establishment of procedures "for the control of inmates for necessary administrative purposes other than punishment." It sets forth the "reasons and conditions" under which inmates may be confined in administrative segregation and the criteria used. These include protective custody, pending investigation, pre-hearing detention, to prevent disruption or collaboration among inmates, to prevent communicable disease, to monitor inmates with a history of aggressive sexual attacks, suicidal tendencies or other mental problems, for "consistent bad behavior," as "holdovers," and as "Other Security Risk." IMPP 20-104(I)(B).

prison regulations.

Clearly plaintiff is in non-punitive segregation, and therefore was not entitled to the due process mandated for disciplinary proceedings under Wolff. See Walling v. Slusher, 976 F.Supp. 1402, 1405 (D. Kan. 1997). The administrative response to plaintiff's grievance to that effect was in accord with prison regulations governing "other security risk" placement in ad seg, and applicable federal law regarding ad seg. Thus, denial of administrative relief on this particular claim was reasonable, and it fails to state a 1983 claim. The court concludes plaintiff's allegations of placement in ad seg without being charged with crimes or disciplinary offenses and without a disciplinary hearing, even taken as true, do not state a claim and must be dismissed.

**LIBERTY INTEREST**

The court liberally construes plaintiff's complaint to allege denial of the process due in connection with his placement and extended retention in administrative segregation. Plaintiff implies he has a right to be free of administrative segregation protected by Due Process. Plaintiff argues that mandatory language in Kansas prison regulations created a liberty interest in his being free from ad seg absent due process, and that conditions of his confinement in ad seg at EDCF are "atypical" and therefore implicate due process. Having thoroughly considered plaintiff's allegations, the court finds he has not stated sufficient facts to establish a liberty interest.

On numerous occasions the courts in this district have found that Kansas prison regulations on segregation do not contain mandatory language which creates a protected liberty interest. See Rush v. McKune, 888 F.Supp. 123, 125 (D.Kan. 1995); Lloyd v. Suttle, 859 F.Supp. 1408, 1410 (D.Kan. 1994); Dotson v. Maschner, 764 F.Supp. 163 (D. Kan. 1991); cf., Abbott v. McCotter, 13 F.3d 1439 (10th Cir. 1994) (Utah regulations concerning administrative segregation did not create liberty interest; regulation allowing segregation "when circumstances make it necessary" did not so limit authorities' discretion as to create liberty interest).  In any event, the U.S. Supreme Court has made it clear that after Sandin, "the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life'."  Like the Supreme Court in Hewitt, the Tenth Circuit has explicitly held that "the transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence."  Penrod v. Zavaras, 94 F.3d 1399, 1406 (10th Cir. 1996) (quoting Hewitt, 459 U.S. at 468); see also Everson v. Nelson, 941 F.Supp. 1048, 1050 (D.Kan. 1996) (placement of inmate in segregation for allegedly requesting sexual favors from other inmates not violation).  Administrative detention implicates constitutional due process only if the confinement is "the type of atypical, significant deprivation in which a state might

conceivably create a liberty interest." <u>McDiffett v. Stotts</u>, 902 F.Supp. 1419, 1426 (D.Kan. 1995) (*quoting* <u>Sandin</u>, 515 at 485); <u>Speed v. Stotts</u>, 941 F.Supp. 1051, 1055 (D.Kan. 1996) (*citing* <u>Sandin</u>, 515 U.S. at 486).

Plaintiff asserts his confinement in ad seg amounts to "significant deprivation" based on his numerous allegations of deprivations and restrictions discussed earlier herein. However, plaintiff does not allege sufficient facts indicating that the conditions in ad seg at EDCF are "atypical." In <u>Sandin</u>, the Supreme Court compared the conditions imposed on inmates in disciplinary segregation with the conditions in administrative segregation and protective custody. <u>Gaines</u>, 292 F.3d at 1225, (*citing* <u>Sandin</u>, 515 U.S. at 486). They instructed that a court must have evidence of the degree and duration of the plaintiff's restrictions, as compared to typical inmates, in order to adequately determine whether confinement has created an "atypical, significant hardship." <u>Id</u>. at 1226. The Tenth Circuit Court of Appeals, is among the majority of circuits which, when assessing whether conditions of disciplinary segregation pose an atypical and significant hardship under <u>Sandin</u>, have principally compared the challenged conditions to those of administrative segregation and protective custody within the same prison. See <u>Perkins v. Kansas Dept. of Corrections</u>, 165 F.3d 803, 808 (10th Cir. 1999) (*quoting* <u>Sandin</u>, 515 U.S. at 484)(under <u>Sandin</u> the "key comparison" is between disciplinary and nondisciplinary segregation); <u>Sandin v. Conner and Intraprison Confinement: Ten Years of Confusion and Harm in</u>

<u>Prisoner Litigation</u>, 45 BCLR 423, 441 (March, 2004), *citing* <u>Gaines</u>, 292 F.3d at 1225-26 *and* <u>Johnson v. Bureau of Prisons</u>, No. 99-3239-KHV, 2000 WL 574881, at *4 (D.Kan. Apr. 4, 2000, unpublished).  Plaintiff does not allege facts establishing that the conditions in ad seg at EDCF are more restrictive than other forms of incarceration, segregation in particular, in Kansas.

Moreover, contrary to plaintiff's claim, regulations governing conditions in segregation units within the KDOC indicate conditions in ad seg are "typical."  KDOC Internal Management Policy and Procedure (IMPP) Section Number 20-105(IV)(A) provides that "Each inmate in administrative segregation shall be treated as nearly as possible like any other inmate in the general population of the institution or facility" and "shall retain such privileges and property as are commensurate with the particular circumstance or condition for which the inmate was placed in ad seg."  IMPP 20-105 (IV).  IMPP 20-101 (SEGREGATION: Minimum Standards for the Operation of Segregation Units)(Effective 07-21-03) establishes "minimum standards" with regard to the operation and maintenance of segregation units within KDOC facilities.  It provides minimum standards for "the manner in which inmates are fed, clothed, housed, and dealt with on a daily basis."  It mandates that its provisions "shall apply to disciplinary and administrative segregation alike."  It provides for "food from the normal diet of inmates not in segregation;" cells, whenever possible, "at least as large as other cells in the institution" which are adequately lighted during daylight hours; all "necessities of

civilized existence" including toilet, bedding and water; the
opportunity to shave and shower at least 3 times per week;
exchange of clothing, bedding and linen, and hair care "as
frequent and of the same quality as for the general population;"
and clothing that is not degrading and basic personal items.
IMPP 20-101(I)(A)&(B). It also provides that an "inmate's right
to communicate with an attorney or a person or agency designated
to receive complaints shall not be interfered with," and for
"access to legal and reading materials." It additionally
provides for access to medical services and medications. IMPP
20-101(II). Inmates in segregation are to be provided "the same
opportunities for writing and receiving letters" as the general
population. Visitation and telephone privileges are "allowed on
a restricted basis." The IMPP also provides that "each inmate
confined in disciplinary and administrative segregation shall be
allowed to exercise outside the cell" for at least one hour per
day at least five days a week, and, weather and staff permitting,
exercise outdoors. Generally, segregation inmates are to be
provided "adequate exercise to maintain health." IMPP 20-
101(III). Administrative segregation inmates are also to be
provided with "reasonable access to programs and services"
including "educational services, commissary services, library
services, social services, counseling services and religious
guidance." IMPP 20-101 IV(A).

Even though plaintiff points to greater restrictions on some
activities in ad seg than in general population, the court
concludes there are insufficient factual allegations in the

complaint to suggest that the deprivations alleged in this case rise to the level of atypical or significant hardship, such that they involve a protected liberty interest rather than a normally expected incident of confinement.  See Penrod, 94 F.3d at 1399; cf. Amos v. Nelson, 923 P.2d 1014, 1018-22 (Kan. 1996)(conditions in ad seg at EDCF examined and found not significant, atypical hardship).

**VIOLATION OF PROCESS DUE**

Even if plaintiff established his entitlement to a liberty interest so that Due Process is implicated by his administrative segregation, he has not alleged facts sufficient to indicate its violation.  An inmate placed in administrative segregation must have received notice of the reasons for his placement and state officials need only have conducted an informal, nonadversary review of the information supporting the inmate's confinement, including whatever statement plaintiff wished to submit.  See Wilkinson, 125 S.Ct. at 2397 (Where the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, nonadversary procedures set forth in Greenholtz and Hewitt provide the appropriate model); Hewitt, 459 U.S. at 472, 476.  Hewitt, cited with approval in Wilkinson, contained no requirement that an evidentiary hearing be held to determine the credibility of the information relied upon by prison officials in making security classifications and specifically noted that a prisoner who has not engaged in

improper activity may still be deemed a security risk and placed in administrative segregation.  <u>Hewitt</u>, 459 U.S. at 474.  The informal review need not occur before placement in ad seg, but within a reasonable time afterward.  <u>Id</u>. at 472, 476.  If the confinement in ad seg is lengthy, <u>Hewitt</u> suggests periodic review of the inmate's status is required.  <u>Id</u>. at 477 FN9.

Plaintiff's own exhibits and version of events indicate he has received fairly detailed notice of the reasons for his placement in ad seg, review were held, and he has been given opportunities to present his views.  He declined to appear at one monthly review according to the latest review report exhibited.  Plaintiff also indicates his status has been reviewed on a regular basis.  Thus, even if plaintiff could prove that his due process rights are implicated by his placement and retention in ad seg, his own factual allegations indicate he has received the process due.

The recent opinion of the U.S. Supreme Court in <u>Wilkinson</u> is instructive.  In <u>Wilkinson</u>, the Supreme Court considered conditions at Ohio State Prison, the only supermax facility in Ohio, and found they were "more restrictive than any other form of incarceration in Ohio."  <u>Wilkinson</u>, 125 S.Ct. at 2389.  They opined that incarceration at OSP is "synonymous with extreme isolation," but noted in particular two "atypical" conditions -- inmates placed at OSP lose their eligibility for parole while there, and their placement is for an indefinite time limited only by their sentence.  The Supreme Court  held that "under any plausible baseline" conditions at OSP created a liberty interest

in freedom from placement at OSP.  _Id_. at 2394.  The Supreme
Court then proceeded to determine what process was due and
whether it had been provided.  In doing so, they discussed
Ohio's published procedures for determining placement at OSP in
detail.  They cited the new policy at OSP as providing more
guidance regarding the factors to be considered in placement
decisions and affording more procedural protection against
erroneous placement than the old.  _Id_. at 2390.  They set forth
how the prison policy "appeared to operate" from their
construction of its text and the arguments of the parties.  They
found the Ohio policy provided for notice to the inmate of the
reasons for classifying him to OSP and an opportunity to be
heard, but not witnesses.  _Id_.  They stated requiring "officials
to provide a brief summary of the factual basis for the
classification review and allowing the inmate a rebuttal
opportunity safeguards against the inmate's being mistaken for
another or singled out for insufficient reason," and requiring a
"short statement of reasons" safeguards against arbitrary
decisionmaking and provides the inmate a basis for objection on
review.  _Id_. at 2396.  The upheld Ohio policy also provided
"multiple levels" and subsequent review of decisions recommending
OSP placement.

The Supreme Court in _Wilkinson_ noted that the State's
interest in prison management was "a dominant consideration."
They discussed prison security as

> imperiled by the brutal reality of prison gangs . . .
> .   Clandestine, organized, fueled by race-based
> hostility, and committed to fear and violence as a
> means of disciplining their own members and their

rivals, gangs seek nothing less than to control prison life and to extend their power outside prison walls (cite omitted).  Murder of an inmate, a guard, or one of their family members on the outside is a common form of gang discipline and control, as well as a condition for membership in some gangs (cite omitted).

Id. at 2396.

The regulations governing administrative segregation in effect at EDCF and throughout the KDOC, on their face also provide adequate process for placement in administrative segregation adequate to safeguard any liberty interest an inmate may have in not being assigned to ad seg at EDCF.  IMPP 20-105 (effective as amended 8/21/04), "SEGREGATION: Basic Operations of Administrative Segregation," provides that all placements in ad seg must be approved by a shift supervisor of the segregation unit manager, and the shift supervisor is to forward a written report to the warden before the end of the shift.  Every inmate placed in ad seg must receive a medical/mental evaluation as soon as possible after placement.  If an emergency situation does not exist or immediate placement is not necessary, "inmates placed in seg shall be provided with a hearing prior to placement in order to provide them with an opportunity to present objections, explanations or reasons as to why such a placement should not be effected."  IMPP 20-105(I)(B).  IMPP 20-105(II) requires that an "administrative-segregation report" be completed in all cases indicating "specifically, the reason for placing the inmate in ad seg."  IMPP 20-105(III) requires written notice to the inmate of the reasons for the placement "stated in sufficient detail to allow the inmate to understand the reasons and to make a response to them."  IMPP 20-106 (effective as amended 7-21-04) provides

26

review of administrative segregation placement by an "Administrative Segregation Review Board" (Board). The Board, appointed at each facility by the Warden and consisting of one person each from the security, clinical, and classification staffs, "shall hold an initial hearing to review the placement decision" within 3 working days of an inmate's initial placement in ad seg. The inmate is to be interviewed by the Board and given the opportunity to present his or her case. IMPP 20-106(I)(A)&(B). Under IMPP 20-106(II)(A) the Board "shall review the status of each inmate confined in ad seg once per week for the first thirty days, and once per month thereafter." If the Board recommends retention in ad seg, it must be by unanimous vote and it is the final action for that review period. Otherwise, the Board may recommend to the warden in writing that the inmate be returned to general population, or transferred to another facility. The inmate may submit written requests for release to the Board. IMPP 20-106(II)(D). IMPP 20-107(I)(B) provides that the warden or a member of the staff which reports directly to the warden "shall make a weekly on-site spot check, interviewing at least two inmates, to determine compliance with institution and department policy, rules and regulations." Id. at (B). A log is to be kept of the inmates interviewed and the staff member checking. Under IMPP 20-106(III) the program management committee of each facility must review "those inmates maintained continuously in ad seg at least every 180 days." The warden is to annually submit "a report to the Deputy Secretary for Facilities Management for all inmates continuously held in ad

seg for a year or longer, and on each anniversary thereafter." Id., (IV).

The court may presume that defendants followed their published procedures in plaintiff's case unless and until plaintiff specifies which of these procedures were not followed. Since plaintiff mainly claimed entitlement to procedures for disciplinary segregation, he has not stated facts indicating that the procedures either in Wilkinson or the Kansas Administrative Regulations governing administrative segregation were denied. If plaintiff alleged facts tending to demonstrate that the KDOC policies do not, in practice, operate as indicated and that the process constitutionally required for ad seg was not provided, then he might state a claim for relief. The duration of plaintiff's administrative confinement can be a significant factor. However, extended duration alone does not dictate the court's decision in this case, in light of prison officials' repeated periodic assessment that plaintiff has remained a security risk, the serious nature of the security threat posed by plaintiff, and the deference to be afforded the security assessment of individual inmates by prison administrators. See Whitley v. Albers, 475 U.S. 312, 321-22 (1986). The placement in administrative segregation of members, particularly leaders, of an unsanctioned prison group responsible for prison violence is obviously rationally related to the legitimate goal of ensuring prison security. See Sandin, 515 U.S. at 482-83, (federal courts must "afford appropriate deference and flexibility to state officials trying to manage a volatile environment").

In sum, plaintiff has not alleged facts establishing either that he enjoys a liberty interest to avoid placement in ad seg at EDCF, or that his initial placement in ad seg and his continued segregated confinement are not in compliance with applicable state regulations, which on their face provide adequate due process.

## EIGHTH AMENDMENT VIOLATIONS

Plaintiff similarly fails to adequately plead exhaustion of his claim of cruel and unusual conditions in ad seg, and to allege sufficient facts to state an Eighth Amendment violation. He does not allege facts indicating deprivations in ad seg are "sufficiently serious" to amount to cruel and unusual punishment or that particular defendants knew and disregarded excessive risks to his health or safety resulting from such restrictions. Farmer v. Brennan, 511 U.S. 825, 834-37 (1994); Perkins, 165 F.3d at 890; Rush, 888 F.Supp. at 125. Plaintiff's broad allegation of cruel and unusual punishment fail to identify any specific risk of harm.

## CONCLUSION

For all the foregoing reasons, the court finds that the complaint is conclusory and fails to state an adequate claim. Plaintiff shall be given time to amend his complaint to allege sufficient facts in support of his constitutional claims.

**IT IS THEREFORE BY THE COURT ORDERED** that within twenty (20)

29

days, plaintiff shall submit an initial partial filing fee of $77.50. Any objection to this order must be filed on or before the date payment is due. The failure to pay the fees as required herein may result in the dismissal of this action without prejudice.

**IT IS FURTHER ORDERED** that within the same twenty (20 days, plaintiff must supplement his complaint to show total exhaustion of administrative remedies and amend his complaint to state a claim. Failure to file a timely response may result in the dismissal of this action without further notice.

**IT IS SO ORDERED.**

Dated this 29th day of July, 2005, at Topeka, Kansas.




s/Sam A. Crow
U. S. Senior District Judge